Case No. 17-5042. Reporters Committee for Freedom of the Press et al. Appellants v. Federal Bureau of Investigation et al. Ms. Townsend for the Appellants, Mr. Busa for the Appellees. Good morning, Your Honors. May it please the Court. Good morning. The issue before you today is whether the FBI carried its burden on summary judgment to demonstrate beyond material doubt that it conducted a search reasonably calculated to uncover all relevant documents in response to three FOIA requests submitted by the Associated Press and the Reporters Committee for Freedom of the Press concerning FBI impersonation of members of the news media. Counsel, may I ask you, what do you think is your best argument that the search of the FBI was inaccurate? It's so hard to pick just one, Your Honor. I know. I just want you to pick the best. I think in view of the record before this Court, which is replete with positive indications of overlooked materials and locations that the FBI... I would list the following, Your Honor. I think the FBI did not search the offices responsible for responding publicly to the outcry in October of 2014. Specifically? The Office of Public Affairs, Your Honor, the Office of the Director. I think the failure to search the Office of the Director, given that FBI Director at that time, Comey, took the unusual step of writing a letter to the editor in November of 2014. Is that your best argument, that the Director's Office wasn't searching? I think, Your Honor, that looking at the record as a whole, there are numerous other positive indications of overlooked materials. I think if we look to the Inspector General's report, for example, which we were unaware of until September of 2016, that indicates that the Inspector General reviewed more than 2,000 pages of records concerning the Seattle Timberline investigation alone, which is far different from the fewer than 300 pages of records that were... We've identified the St. Louis Field Office, as well as other specific field offices that were previously identified in a public filing, as having used network investigative techniques like those used in the Seattle Timberline case. We pointed to the offices responsible for responding to congressional inquiries in light of Senator Leahy and Senator Grassley's correspondence to the FBI concerning the Seattle Timberline office. We pointed to the fact that the FBI failed to locate any documents concerning the creation of its interim policy concerning impersonation of the news media, notwithstanding the fact the Reporters Committee expressly requested all records concerning the FBI's guidelines and policies concerning undercover operations and activities in which a person may act as a member of the news media. And I want to stress, Your Honor, that under FOIA, the requester has an obligation to reasonably describe the records that the requester is seeking. But in the 1974 amendments to FOIA in which Congress set out that requirement, it also made clear that the agency was required to use its expertise and its knowledge to identify the locations. How could they do any better than providing every office they were searching with your request? With your exact FOIA request? I think with respect to the structure of the search that was conducted by the FBI, the requests were divided into two groups. The Reporters Committee, in fact, did not request only records related to the Seattle Timberline incident. It used that as an example to seek all records concerning any incident in which the FBI had utilized links or what appeared to be links to news media articles. Why would the FOIA request itself be the appropriate thing to send to the offices, assuming the FBI sent it to all the appropriate offices? I understand your question, Judge Silberman. With respect to the adequacy of the declarations, the FBI has indicated that with respect to the components that it tasked with searching for Group 2 records, and as well as Group 1 records, so the Operational Technology Division, for example, it provided just the verbatim text of the FOIA requests. How can you do any better than that? We're not objecting to the FBI providing the verbatim text of the FOIA request. What we object to is, with respect to the adequacy of the affidavits, we do not know what those components then did. I was a little confused about what the phrase search terms meant, although we use it over and over in our cases, but it's not clear to me whether that's a linguistic phrase. Is that what it is? For electronic records, I think search terms means the actual terms that are utilized to search an electronic record system. For example, with respect to the central record system, we know that the FBI used three search terms related to Timberline to search that central record system at the litigation stage, but we have no indication of the nature of the search that was performed within the components, places like the Operational Technology Division. That's not included in the affidavit. What do you mean by the nature of the search? We don't know if that search was electronic, of electronic records. We don't know if it was of paper records. If it was of electronic records, we do not know what search terms were utilized. We do not know which of the components turned up records, as opposed to which of the components did not. We know because no records were identified with respect to the first reporter's committee FOIA request that OTD did not turn up any records, but for the rest of the components, we don't know what the results were. And again, that's similar not only to, I would say, Morley, but this Court's far more recent decision in Aguilar in which the adequacy of the affidavit was challenged, and this Court, Chief Judge Garland held it was inadequate because it did not identify that type of information. I would also point the Court, I know I mentioned the 2,000 pages of records that were reviewed by the Inspector General in connection with its investigation into the Seattle Timberline investigation alone. I would also note that we pointed out to the District Court specific documents that were mentioned in the Inspector General's report that were not included on the Vaughn Index and were not provided to appellants in response to their FOIA requests, which suggests they were not located. I'm a little confused about the dates. Does that, as part of the argument, turn on your ability to challenge the date of search? Is that dependent on that, on the date of search issue? I don't think so, Your Honor. The date, we learned during the course of litigation in the second. If we think your challenge to the date of search cutoff is forfeited here, can you still rely on the Inspector General report? I think we can, Your Honor, because what we utilize the Inspector General's report for is to point to the fact that there were, it's evidence of positive, it's positive indications of overlooked materials. So, in other words, the Inspector General's gathered, presumably gathered information in response to the, presumably the public outcry surrounding the Seattle Timberline incident in the fall of 2014. Now, we know now that in December, that the FBI utilized... But the Inspector General reports were after, came after the cutoff dates. That's true, Your Honor, except the documents that we cited to, the specific documents, predate that. So, the specific documents are from 2007. So, while the Inspector General's report brought those to our attention in September of 2016, they were in the possession of the agency, certainly before the December 2014 and January 2015 search cutoffs that were utilized by the FBI. And I would take this opportunity, Your Honor, to stress that we think that those search cutoff dates are arbitrary and unreasonable. What about whether they're, whether your argument about them is worth it? Because you say in the, in your reply brief in footnote two, you say that you preserved that argument, but I couldn't find it in the blue brief, in your opening brief. Did I miss it? No, Your Honor, we think that that argument has been fully preserved. We raised this issue at the district court level. I agree with that, but where did you raise it? You have to raise it in your opening brief here. Your Honor, I think that under the circumstances where we have raised it at the district court level, where the district court... You can ignore it in the opening brief? Well, I think, Your Honor, that we would take the position that to the extent that it is an argument that the FBI is relying on, which we know that it is, to justify the search that it conducted, to argue that the search that it conducted was adequate, we think we fully are entitled to respond to it in our reply brief, which we did. I would say that given the fact that it was fully raised before the district court and the, in fact, Judge Leon at the district court level rejected that argument. He concluded that the date of search cutoffs were reasonable. See, that's why we require those arguments to be made in your opening brief here. I understand, Your Honor, and I think that those arguments are part and parcel of the entire reasonableness inquiry. I think this court has made clear, both in the GE and Judge Tatel, in your opinion in public citizen, that it is the agency's burden to justify the reasonableness of its search. I've written about a dozen public citizen cases. Which one? Public citizen against Department of State. I've probably got three of those. How about a date? It is 2-76-F-3-6-34-2002, Your Honor. All right, thanks. What did I say there? What was the point of that? I'm sorry. Both of those, both public citizen and this court's prior decision in the GE, he addressed the reasonableness of the use of a date of search cutoff that was far distant or far distant and removed from the actual date in which, in this, I would say in this case, searches were conducted, but certainly when records were released in response to the request. So in this case, no records were released to the Associated Press or the Reporters Committee prior to litigation. There were searches that were run at the litigation stage, which means after August of 2015, and there were no records released. Counsel, are you challenging the statement in the affidavit as to when the search was started? I am challenging, well, the affidavits state that the searches were initiated on those dates. We know for a fact from the record, Your Honor, that they were not completed until well after litigation because there were searches that were conducted at the litigation stage. It is puzzling to us, and we did not learn until well into litigation that these date of search cutoffs were utilized. These date of search cutoffs, which I actually should— An agency starts a date of search on January 1st, 2017, and then litigation develops. And so a year later, counsel for the government asked the agency, gee, before we go to court or while we're in court, go back and make absolutely certain you got everything in your initial search. Are you suggesting that then you've shifted the date to that later point? No, Your Honor, that's not what we're suggesting. What we're suggesting, and I would make the point, too, that we're not taking the position that it's improper for the government to ever under any circumstances use the date that it initiated a search as a cutoff for that search. However, in circumstances such as these where we were wholly unaware that this date was being used until well into litigation, and, in fact, no records were released to us until over a year past those date of search cutoffs. Eight months later into litigation, I think that raises at least a material factual dispute as to the adequacy or the reasonableness of the use of those date cuts. They could have been fighting inside as to how much they turned over. They could have, Your Honor, but there's no indication on the record what was done during that time period. There's nothing in the declarations to indicate that. I'd like to reserve the remainder of my time for rebuttal. Sure. Good morning, and may it please the Court. Joe Busa on behalf of the government. I'd like to begin by highlighting why the FBI's search was reasonable. There were a number of overlapping FOIA requests in this case. Some of them were reasonably well defined in a concrete context. So, for example, when searching for media impersonation to deliver a surveillance tool in the Timberline case, the case we know about, the agency was able to search both the Central Records System and the Seattle Field Office, obtain the full investigative file in that case, and go through page by page, identify every single responsive record. Similarly, when searching for policy and training documents related to media impersonation, the agency was able to go to several divisions in charge of maintaining and implementing those policies and training documents, the inspection division, the training division, the Office of General Counsel. The agency identified the policies that applied at the time that were within the search cutoff dates in this case. But then there's a separate set of requests that is more nebulous and asks for information not even known to exist. I'm here referencing the so-called Group 1 search for documents about media impersonation to deliver surveillance technology in general. In other cases, other than the Timberline case. Just media impersonation. It doesn't have to be electronic. No, actually, Your Honor, I believe the Group 1 search was specifically about delivering surveillance technology. Media impersonation in order to do that. Group 2, one of the requests asked for any policies relating to impersonation of media, right? That's exactly right, Your Honor. And the search conducted of the inspection division, the training division, the Office of General Counsel, turned up several policy and training documents related to that kind of complex investigative tactic. It didn't turn up any other instances, right? That's correct. Any other instances, yeah. That's correct. Well, see, the argument the Reporters Committee makes about that is they cite cases like Aguiar, Oglesby, Debrew, Morley. And we've got a lot of these cases which say that they all say basically that passing along the FOIA request to the office isn't enough. That the agency needs to actually describe how the search was done. That's what all these cases say, right? You agree with that, right? Isn't that what they say? So they do say that, Your Honor, but I think it's important to highlight they say it in a specific context. Well, but they say it in the context, I mean, there's four or five of them here, and they all require that it be described. And in paragraphs 38 to 45 where they describe the search and the affidavit, there's no description at all. All it says is that it lists the divisions that the FBI thought would be responsive. It said it distributed the substance of the FOIA request to those offices, and it asked each to search. And then the last sentence says, it says, it completely concludes by saying it advised us that they found nothing. There's no description of how it was done. There's no search terms. There's no specific description. And every one of these cases, in fact, this affidavit, I went back and looked at the affidavit in the Ag ER in that case. They're identical. They're identical. Your Honor, I think it's important to identify the difference in the context between this case and all of your prior cases talking about search terms. All of those cases are asking for specific information about an identifiable individual or code word or, you know, in an Ag ER context, for administrative warrants known to exist within a single investigative file. So if you're dealing with that kind of concrete request for information in the... I understand that. Well, that could be. You could be right about those cases. But here there's nothing. I mean, it seems to me the affidavit could have said, look, this is more difficult. This is a generic search. This is a generic question. But here's specifically what we did to overcome that. Here's how we searched the documents. Here's what we looked for. I mean, for example, did they search for the word malware? Did they search for media impersonation? We don't know anything about that. We don't know at all what they did. Your Honor, we know that when they were searching the central record system, they did search for the term media impersonation. But to step back and look at the targeted search... Wait a minute. Why do we know that? We know that from the second party declaration saying that... Specifically asked for media impersonation. In the central record system, yes, Your Honor. Is that nowhere else? Yeah. So we don't know what specific search terms every single employee in the operational technology... That's exactly the point. Without the search terms, without the description of how it was done, the FOIA seeker has no way of challenging the adequacy of the search. And that's what our cases say. But again, Your Honor, in the context of a concrete piece of information known to exist in documents in a specific record, it is reasonable to require specific search terms to be provided. Do we have a case that says that this rule we have, that we've stated at least five times, that the agency has to actually describe how the search was done? Can you cite a case which says that's not so in a situation where the request is, as you put it, more generic, is that your point, or less defined? Your Honor, I don't think you've ever addressed that situation before either way in your precedence. But just to explain why I think it actually is reasonable to describe the search at the level of detail that these affidavits do, here we searched, by my count, at least eight different offices and divisions of the FBI. But we don't know how. I mean, isn't that Judge Tatel's question? That is Judge Tatel's question, but I think that it's important to recognize the level of detail that would be required if you were to say that the affidavits have to explain every system of records that were searched in those offices and all the search terms. So, for example... But then we don't know. I'm sorry to interrupt, Your Honor, for example, but we then don't know how the search was conducted. The mere fact that certain places were contacted and did something doesn't tell us how it was done in those places. And I'm questioning, or I have a question about, how the context of a case really affects that. Okay, we're searching for something specific, we're searching for something more general or vague, but the affidavit could still, in the latter kind of case, describe with specificity what was done. So, I don't think so, Your Honor, for the following reason. If you're searching for something nebulous and vague, not known to exist, as these affidavits indicate, the employees were all told to use their best judgment to find these records. The FOIA office would have a hard time defining ex ante, what are the best search terms to use when you're searching Kathy's email inbox or Bill's personal file system on a shared drive, say, in a given division. Those employees would know best how to go about that specific kind of search. But why wouldn't you describe exactly how they did it? Your Honor, I think... This is not an ex post problem, it's an ex ante. How did you do it? What did Office X use as the search terms based on the FOIA request? Your Honor, in this case... Most obvious, of course, is media impersonation. Mm-hmm. Your Honor, what we know is that in this case, many employees throughout the operational technology division were asked to perform searches of their own emails, for example, or their own systems of records, or their own file cabinets, for example. They were asked to search every single retrievable system of records. In that instance, if the FBI were required to list in gory detail every system of records that was searched and every search term every employee used, I think you'd see an affidavit that would go on at more length than you've required... But I guess maybe it's a front-end question, which is should they be given more specific direction on the front end of what and how to search. I think that's right, Your Honor. That is the question. And I think it's actually more reasonable to tell each individual employee, look, we're searching for a nebulous concept. We don't know if there's other instances. We need you to use your best judgment about how best to... Why is it so nebulous? Why is it so nebulous? Media impersonation is a... It doesn't seem very nebulous to me. I say nebulous, Your Honor, only because it's in, say, a context we don't know about. So, for instance, the Timberline search, we can find the Timberline case file and go through it page by page as we did. If you're searching for other instances not known to exist, when a search of the central records system reveals nothing... No, it's not so much instances. It's a question of policy. What is the policy in the FBI, or what was the policy at the time of the cutoff date, with respect to media impersonation? Oh, Your Honor, for those, we found a number of policies that apply. From reading the Office of Inspector General's report, there's every reason to believe we identified every policy that applied to the 2007 instance. Of course, there's an argument to be made about the interim report that came out in 2015. I'm not talking about the 2007 instance. I'm talking about the general policy. Your Honor, again... I'm puzzled about why the head office wasn't looked at, the director's office. Why not? Your Honor, as a starting position, the FOIA office can restrict itself to the four corners of the FOIA request, and nothing about these FOIA requests pointed to the office of the director as a place likely to have responsive materials. With respect to the basic policy of media impersonation or not? I think that's... Perhaps I'm influenced by the fact that many years ago, when I was deputy attorney general, and maybe even acting attorney general at the time, I found the secret and confidential files of J. Edgar Hoover in the outer office of the director. Your Honor, I think that... You weren't suggesting, by the way, in response to Judge Silberman, that the FOIA requester has to identify the offices to be searched within the agency? No, Your Honor, I'm just referring to... I don't understand your point. I'm just referencing... You said the requester has an obligation to be specific. You limit yourself to the four corners of the request. I agree with that. But that doesn't mean there's no obligation for the requester to say, I want you specifically to search the following divisions of the FBI. No, I agree, Your Honor. Then what's your point? I was very... You were specifically asking about why you wouldn't search the director's office when the question is, what is the policy of the FBI with respect to media impersonation? Because those policies are maintained and implemented by the other divisions of the FBI. There's no reason to think that when we searched the inspection division, the training division, the office of general counsel, there was something else we were missing that would have been found in the office of the director but would not have been found anywhere else. There are no positive indications of overlooked materials regarding that question, Your Honor. Let me just ask you a related question to what Judge Silberman is asking. So the affidavit says that when it searched for TinderLine, it listed a bunch of the Harding Declaration, lists a bunch of divisions like where they thought they'd find documents, the behavioral analysis unit, the training division, and national covert operations. So they thought they were reasonably likely to have that. Okay. But the Harding Declaration doesn't explain why they weren't searched for other incidents. In other words, why would the FBI think that those three were reasonably likely to have documents about TinderLine but were not reasonably likely to have documents about other incidents of media impersonation? Your Honor, my understanding is that the inspection division, training division— I'm going to ask you two parts. Do you agree with me? My first point is the affidavit doesn't explain it. It doesn't give a reason for that. It doesn't go on and say, well, we didn't search those three because. It just isn't there. There's no explanation. You agree with that, right? No, I don't think so, Your Honor. I think that for those specific divisions, we searched for the policy and training documents regarding media impersonation in general for the specific Group 1 requests about media impersonation to deliver a piece of technology. We went to the office that is in charge of developing, implementing, authorizing the development of the deployment of that specific piece of technology. And I think the Harding Declaration makes that quite clear. Well, let me continue on this question of policy. If a new director of the FBI comes in, wouldn't he or she wish to know what the policy is with respect to impersonation of media in investigations? And it sort of puzzles me that nowhere is there indication of what the policy is before the cutoff date. No, Your Honor. We identified many policy and training documents and produced them to the. . . to impersonate media in an investigation. The answer is no. Those documents don't specifically address that. And the OIG report actually explains why that would be the case. The OIG report explains that there was no policy specifically on point regarding media impersonation specifically at the time of 2007 until the interim policy was released in 2015. So it's not surprising that the search did not reveal policies specifically about media impersonation, Your Honor. I see my time is drawing short, and so. . . I don't think you have any more questions here, do you? No, thank you, Your Honor. I would just ask that you affirm. Okay, thank you. Does Ms. Townsend. . . how much time does Ms. Townsend have left? Ms. Townsend has 59 seconds remaining. You can take a minute. Thank you, Your Honor. I'll just respond briefly to the argument that the Group 1 search, which consisted of the Reporters Committee's first request, which was for all incidents of news media impersonation involving the use of links or websites that appear to be news media websites, that that was nebulous and sought records that were not known to exist. Where that falls apart is the fact that we provided as an example the Seattle Timberline case. Certainly Seattle Timberline documents fell within that category, and yet the sole search of one office, the Office of the Operational Technology Division, failed to locate those documents. At that point, I think the FBI should have said, obviously our search method here is not adequate because they pointed us to a specific incident of media impersonation, and our search for everything didn't turn up any records related to that incident. Thank you very much, Your Honor. Thank you, both the cases submitted. We will take a brief recess.
judges: Tatel, Kavanaugh, Silberman